May it please the Court, Stephen Broom from Quinn Emanuel. We've been invited by the Court to act as amicus and present argument today in support of the petitioner, Mr. Ali Amiri, and on behalf of our firm I'd like to thank the Court for that opportunity. And we would like to thank Pro Bono Council for the efforts that are very helpful to the Court. At the immigration hearing, Mr. Amiri testified that he fears persecution because he has rejected Islam. The Iranian government is aware of that fact, and such conduct is punishable by death in Iran. The agency did not identify any inconsistencies in this testimony, but nevertheless denied Mr. Amiri's asylum, withholding of removal, and convention against torture claims on the basis of an adverse credibility finding. Now, the government does not dispute that if the adverse credibility finding were not supported by substantial evidence, then Mr. Amiri would be entitled to all three forms of relief. Nor does the government dispute that two of the asserted grounds for that adverse credibility finding, the timing of Mr. Amiri's asylum application and his reason for wanting to avoid military service, are not supported by substantial evidence. The government essentially hangs its hat on purported inconsistencies in Mr. Amiri's testimony regarding the Jewish conversion classes, in particular when those classes would begin. Even a cursory review of the transcript reveals that Mr. Amiri's testimony was presented in a proceeding that was plagued with translation difficulties and confusing questions from the IJ, including the IJ's inquiry as to why Mr. Amiri would come to the United States as opposed to Israel, given that in the IJ's view, Israel is the right place if you want to be a Jew. The record reveals that despite such confusion, Mr. Amiri testified credibly and consistently throughout the hearing. He established a well-founded fear of persecution and indeed a likelihood of persecution and torture, and any confusion at the hearing about when the conversion classes would begin does not change that conclusion. Now I'd like to briefly address the two asserted grounds for the IJ's adverse credibility finding that the government concedes are not supported by substantial evidence. The first of these grounds is the IJ's finding that Mr. Amiri failed to file his asylum application within one year of his entry. The record is very clear that Mr. Amiri was ready and able to file his asylum application within one year of his entry, but refrained from doing so solely because the IJ specifically instructed him to file it on a specific date beyond one year. Do we have anything in the record that would suggest why the IJ instructed not to file it until January, February? I think if you read the record, Your Honor, it's about 4.51 in the record. It's not entirely clear, but I think it's because there was a master calendar. The IJ was trying to schedule something to do with the master calendar dates. Why would the IJ's proceedings have anything to do with the filing of the asylum? It's not clear from the record, Your Honor, but what is clear from the record is that Mr. Amiri's attorney indicated we could file the application on August 25, 1997. That was within one year of Mr. Amiri's entry to the United States. And the IJ said, well, let me look at the master calendar. On January 7th, you will file the asylum application. That's the date you filed the asylum application. So given that Mr. Amiri was going to be there, why would his counsel agree to such a thing? He was acting upon the advice of the immigration judge, Your Honor. Did the BIA say anything about that order of the IJ? No, it did not, Your Honor. In fact, with respect to the adverse credibility finding, the BIA simply adopted the adverse credibility finding without any opinion at all. Second, the IJ's conclusion that Mr. Amiri left Iran solely to avoid military service is completely inconsistent with the record. Mr. Amiri explained that he sought to avoid military service because he thought the background check might reveal his religious views and because he did not want to participate in a military regime that is openly hostile to Jews and to Israel. These explanations are entirely consistent with his religious persecution claim. And the government takes no issue with this argument in its response to our brief. The record reveals there is a very small population, but not insignificant in numbers, 20,000 to 30,000 Iranian Jews. Are they required to give military service in Iran as well? I'm not sure, Your Honor. I don't believe that that's in the record. But what the government, the Department of State country report does indicate is that Muslims who convert from one faith to another or Muslims who simply, and in fact as this court has recognized, breaking any of the tenets of Islam, engaging in apostasy, is a crime punishable by death. So I'm not sure whether Jews are required to participate in military service as well. The problem here is not the fact of being Jewish. The problem is the fact of conversion. From Amiri's perspective, the status of being a Jew, one can still be a Jew and be left alone in Iran, although somewhat uncomfortably. We have 20,000 to 30,000 Iranian Jews. Well, actually, the Department of State country conditions report indicates that Jews are persecuted by the Iranian government. But there's not a punishment of death. The issue is if you are Muslim, as I understand the record. If you are Muslim and you leave that religion, that's the problem, a greater problem, a different problem. If Mr. Amiri had been born Jewish, then it's unclear. The real problem here is not the status of being a Jew. The problem for Mr. Amiri is the fact that he's leaving Islam behind to become something else. Absolutely, Your Honor. And he probably couldn't choose a worse religion to become than to become Jewish. I think that's absolutely correct, Your Honor. Now, with respect to the purported inconsistencies relating to the conversion classes, which is really the thrust of the government's argument and it is what the IJ primarily relied on, as a preliminary matter, Your Honors, I would submit that those inconsistencies do not go, even if they were supported by the record, and I'll explain why they were not in a moment, even if they were supported by the record, they do not go to the heart of Mr. Amiri's religious persecution claim. The heart of Mr. Amiri's religious persecution claim is that evidence and testimony that establishes a well-founded fear of persecution on account of his religious views. In this case, Mr. Amiri testified that before he had even signed up for these conversion classes, he had rejected Islam, the Iranian government was aware of this fact, and Mr. Amiri was studying Judaism on his own in an effort to convert to that faith. There is nothing in the record that contradicts that testimony. I don't know if it's, you know, properly considered credibility, but it seems to me the IJ was sort of testing the Petitioner's, you know, we'll say, bona fides in his conversion claim. Isn't that what the IJ was doing? Absolutely, Your Honor, and I think that's the obligation of the IJ. You think that's properly, like, does that fit into credibility? It does fit into credibility. But what we have to look at is, as this Court held in Hartouni, absent an explicit, this is a quote from Hartouni, Your Honors, a case we cite in our brief, absent an explicit finding that a specific statement by the Petitioner is not credible, we are required to accept that testimony as true. And the Court in that case cites Damaya's job, and the prayer in there is accepting as true all testimony by the Petitioner other than that question by the IJ. In this case, the only testimony that the IJ questioned related, was that testimony relating to the conversion classes. He did not find any inconsistencies in Mr. Amiri's testimony. Didn't he also question this business about why didn't you go see this, I guess, a Farsi-speaking rabbi in Berkeley, something about that? He did, Your Honor, and that, Mr. Amiri explained, gave a reasonable explanation for why he did not go to the rabbi in Berkeley. He explained that he did not have the financial means to take the multiple trains and buses that would be required for that commute. He also explained that he preferred to participate in the religious life of his community and take these conversion classes in his community. That's reasonable, Your Honor, and to the extent that the IJ found, well, you didn't pursue your religious conversion with sufficient alacrity, in my view. That is subjective speculation about how an alien would pursue their chosen faith, and under this Court's very clear precedent, such subjective speculation cannot support an adverse credibility finding. Your Honors, I have 38 seconds left. You may save it for rebuttal, if you'd like. We'll hear from the government. Your Honor. Good morning. Nancy Friedman for the Attorney General. I'd like to begin with the issue Petitioner raised a few minutes ago, and that is the one-year bar to the filing of his asylum application. I'm somewhat confused, really, about why that issue has come up, because that wasn't an issue in the denial of asylum or any other form of relief. So the government's not relying on the one-year bar? Exactly. Okay. It was not an issue. And do you agree or disagree with counsel's statement that if this petitioner were credible, the matter that he has raised would entitle him to asylum? I do not agree with that, Your Honor. The agency disbelieved his testimony. No, I understand that. That wasn't my question. I'm sorry I didn't make it clear. If, assuming for the sake of this question, that the petitioner were credible, which I know you don't concede, but assuming that he were credible, do the events that he testifies to provide a basis for asylum? Well, assuming that everything he said was true, I think the question that the agency would have had to have asked and decided was whether he had a well-founded fear of persecution. Of course, there wasn't any issue of past persecution in this case. Nothing adverse happened to him while he was in Iran. So the only issue would have been whether his fear was well-founded. And do you contest that a Muslim who leaves Islam in Iran would face future persecution if returned to Iran? I think there's evidence in the record that supports the possibility that that does happen when one is considered an apostate. But the agency hasn't decided that issue yet. Exactly, Your Honor. Exactly. I want to follow up on Judge Craver's question. So if we were to disagree with the government today and found that the record compelled a contrary conclusion on the question of credibility, what should we do? Then under Ventura, it would be remanded to the agency to make the determination on the well-founded fear and, you know, any other issue before. If you say to make the determination, you mean to exercise its discretion? Yes. All right. Yes. Now, I also noticed the Petitioner didn't raise any issues this morning related to all the issues connected to his claim that he's eligible to adjust his status. And so I'm not going to go into those either because those issues are not before the court, as Petitioner seems to concede in his reply brief and did not argue any of those today. So I'll move on as well. So really what we're looking at today is whether the record compels a conclusion other than that the agency reached, that Mr. Amiri was not believable, plausible, consistent in the heart of his claim, which is his supposed conversion and or desire to divert. I guess I don't understand that characterization of his claim. It appears to me that his claim is, I am a Muslim who no longer wishes to be a Muslim. It wouldn't seem to me that it would matter at all if he had read a lot about Judaism and Catholicism and Hinduism and said, well, these are all really crummy religions. I think I'll just be a person of no religion. His claim would still be the same, which is a Muslim who rejects Muslim teachings. So why isn't that the heart of the claim? I absolutely agree with your characterization, Judge Graber, and I should have perhaps have narrowed the issue a bit and focused on what you're asking exactly. And that, I think, really is how the Petitioner claims the Iranian government perceives him rather than what he is. What is the issue here? Are you saying that he does have these beliefs but the Iranian government doesn't know about it or that he doesn't have these beliefs? What is the government's position? The government's position is that we really don't know what to believe about whatever religion or non-religion Mr. Amiri may choose to follow. His testimony was so inconsistent and so implausible in the explanations he gave that the immigration judge just doesn't know what to believe. Well, he says a lot of things that are not contradicted about why he doesn't like the Muslim religion. He was asked that, too, and he talked about the role of women. He talked about the various strictures of the religion that he found offensive or unpleasant. And there's nothing about that that is contradicted or contradictory in the record. That may be so, Your Honor, but those aren't the core issues and inconsistencies that the agency relied on. What is the most important inconsistency? What's the most obvious inconsistency? Well, I'm not sure I can just choose one. Give it a try. I have converted to Judaism starting way back when he filed his asylum application. That's at page 569 of the record. I have converted his words that he wrote in 1998 shortly before the hearing. At that same time in 1998, when he went in front of the immigration judge, the immigration judge started off by specifically asking him, did you write this yourself? Did you write it in English? Do you understand it? And his answers to all of those questions were, yes, he did. So what he wrote is, I have converted. At the hearing in 1998, he said, I have not converted yet. It's a long process. That's at page 477 of the record. And right along with those claims were his claims about whether he has attended classes to convert to Judaism or whether he hasn't. Now, the petitioner pointed out some explanations he gave about why he didn't follow up or go see a rabbi located nearby or related issues. The problem is his explanations were not believable. And the immigration judge wasn't bound to believe them. When you say not believable, what reason did the IJ give for not believing those explanations? Well, he gave quite a few, Your Honor. He started by saying that someone who left his home country and fled because of his desire to convert to a different religion and arrived in the United States and did nothing to follow up on that until a couple months before the hearing raised doubts about whether this was actually why he left. And that was reasonable. I'd like to also point out something about the record evidence that's inconsistent as to what the Iranian government knows, because I think that's really a key point in this case is how the Iranian government might perceive him should he return there. At page 501 of the record is evidence that the petitioner says his mother told him, told the petitioner, that the person who had helped petitioner get a passport to leave Iran later told the government that petitioner had converted or wanted to convert to Judaism, page 501. Later on the- I'm sorry. What are you pointing to at 501? Two months ago when I was talking to my mother, et cetera? Yes. Okay. Yes. How is it that the Iranian government knows that you want to be Jewish? But then I refer later in the record to the letter that petitioner's mother wrote. It's found at page 38 of the record. And that says that the Iranian government learned of petitioner's desire to convert to Judaism when petitioner was detained at the Iranian embassy in Mexico. And that's the only place in the record I see anything about him going or being detained or anything else at the Iranian embassy in Mexico. The mother who supposedly got this information to petitioner about the friend telling the Iranians about petitioner's conversion then says they learned it from the Iranian embassy in Mexico. So his whole claim about any point in his life about converting to Judaism just is inconsistent and not believable. I see I'm out of time, so I thank the Court for listening. Thank you very much for your argument. Mr. Broome, you have a short amount remaining. Yes. Just briefly, Your Honor. The government says that the IJ's conclusion that Mr. Amiri failed to file his application timely. The government says that that was not a basis for the decision. That's inaccurate. On page 442 of the record, the IJ begins his decision. At the top it says, My adverse credibility finding is based on the following. He gives a first reason, which is about four lines long. And then he says, Second, he did not apply for asylum and submitted to the court until January 7, 1998, almost, well, more than a year after his arrival in the United States. Well, it sounds like the government conceded that today. I mean, I would have understood their argument to be. I'm sorry. I misunderstood. I thought the government said that that was not a basis for the IJ's adverse credibility finding. It sounded like they don't believe it's an issue that's adverse to him. So we can sort that out. I guess then we're all on the same page. Did the government, did the IJ rely on the last act the government referred to, the circumstances how the Iranian government knew that he had converted to Judaism? Well, no. No, Your Honor. He did not, because that evidence was not actually before the IJ. That affidavit was submitted subsequent in support of a motion to reopen. But I would submit, Your Honor, that that is not inconsistent with what Mr. Amiri testified to the IJ. It's quite possible that the Iranian government learned, as Mr. Amiri testified at the hearing, that the person who provided him the certificate of military service had informed the Iranian authorities, and that subsequently when he was in Mexico, the Iranian embassy also learned. You're suggesting that the government had two different ways of knowing this? Yes. It's certainly possible, but it's not clear from the record, and it's not something that the IJ relied upon, so it cannot support the IJ's adverse credibility finding. If I might just, I'm out of time. You may wrap up quickly. Okay. The government says, or Your Honor asked, what happens if the adverse credibility finding falls away? Should this case be remanded? No, it should not be remanded. The evidence in the record is sufficient to support a well-founded fear of persecution. The agency hasn't made that decision yet one way or the other. It didn't give an alternative reason. But under this Court's precedent, Your Honor, when an adverse credibility finding is found not to be supported by substantial evidence, it is deemed true. And on many occasions, if – What about Ventura and Thomas? We've gotten slapped around pretty hard for deciding issues that have not already been decided by the agency. I think what the case law establishes, and the government cites the case Soto Olarte, is that when there are material inconsistencies in the petitioner's testimony and evidence that were not addressed by the agency and the adverse credibility finding falls away, that then those material inconsistencies that go to the heart of the claim can – then the Court can send it back for a reevaluation of the petitioner's credibility. Just a minute. Just a minute. I believe the government conceded that if we conclude that the petitioner's – that the finding of lack of credibility is not supported by evidence, then we should send it back for the exercise of the Attorney General's discretion on whether or not to grant asylum. I think government conceded that. For – right. Mr. Amiri would then be eligible for asylum, and the Attorney General would not be able to deny him asylum, given – if the Court holds that – Right. I think counsel said, no, then it's up to the Attorney General to exercise his discretion on whether or not to grant asylum.  I think that's correct. But any other issues beyond the truth of his testimony are not for this Court to decide in the first instance. That's correct. Okay. And with respect to withholding of removal, he would be entitled to withholding of removal because, of course, that is not discretionary on the part of the agency. Thank you, counsel. Thank you, Your Honor. The case just argued is submitted. We appreciate the arguments of both counsel and, again, the participation of lawyers in the pro bono program. It's extremely helpful to the Court to have counsel in difficult cases. Thank you again.
judges: Tashima, Graber, Bybee